UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Sandwich Isles Communications, Inc.,  )
                                       )
            Petitioner,                )
                                       )
      v.                               )      Case No. 17-1036
                                       )
Federal Communications Commission,     )
                                       )
            Respondent.                )

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. § 2342, 5 U.S.C. § 706, Rule 15(a) of the

Federal Rules of Appellate Procedure, and Circuit Rule 15 of the United States Court of Appeals

for the District of Columbia Circuit, Sandwich Isles Communications, Inc. ("SIC") hereby

petitions this Court to review the final order of the Federal Communications Commission

("FCC"), Order No. FCC 16-166 – Memorandum Opinion and Order in the Matter of AT&T

Application for Review; Sandwich Isles Communications, Inc. Petition for Declaratory Ruling,

WC Docket No. 09-133 (Dec. 5, 2016). A copy of that Order is attached to this Petition.

In Order No. FCC 16-166, the FCC granted a petition for reconsideration of its 2010

declaratory ruling and substantially reduced the subsidy payments that would be paid to SIC for

lease expenses for undersea cables that provide telecommunications services to rural areas of

Hawaii.

SIC participated in the procedures below and is adversely affected and aggrieved by

Order No. FCC 16-166. SIC seeks relief on the grounds that Order No. FCC 16-166 is, among

other things, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

14549344-v2

law.  *See* 5 U.S.C. § 706(2)(A).  SIC requests that the Court hold unlawful, vacate, and set aside

Order No. FCC No. 16-166 and grant any other necessary and proper relief.

February 3, 2017

Respectfully submitted,

/s/ John F. Cooney
John F. Cooney
Ian D. Volner
Jamie Barnett
Stephen R. Freeland
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
jfcooney@venable.com

*Counsel for Petitioner*
*Sandwich Isles Communications, Inc.*

14549344-v2

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Sandwich Isles Communications, Inc., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| Federal Communications Commission, | ) |
| | ) |
| Respondent. | ) |

Case No. 17-**17-1036**

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the District of Columbia Circuit, Petitioner Sandwich Isles Communications, Inc. herby certifies that to the best of the knowledge and belief of Counsel:

Sandwich Isles Communications, Inc. ("SIC") is a Hawaii corporation that provides telecommunications services to customers in the Hawaiian Home Lands and the real party in interest in this action. SIC is a wholly owned subsidiary of Waimana Enterprises, Inc., a Hawaii corporation. Waimana is a family owned holding company for SIC. No publicly held corporation owns 10% or more of SIC's stock.

February 3, 2017

Respectfully submitted,

/s/ John F. Cooney
John F. Cooney
Ian D. Volner
Jamie Barnett
Stephen R. Freeland

14549344-v2

Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
jfcooney@venable.com


*Counsel for Petitioner*
*Sandwich Isles Communications, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 3, 2017, I caused a true and correct copy of the foregoing Petition for Review of Sandwich Isles Communications, Inc., Rule 26.1 Corporate Disclosure Statement, and attached Order to be served via United States Overnight Mail, postage prepaid, on the following counsel:

| | |
|---|---|
| Brendan Carr, Esq.<br>Acting General Counsel<br>Federal Communications Commission<br>Office of General Counsel<br>445 12th Street, S.W.<br>Washington, D.C. 20554<br>Phone:  (202) 418-1700<br>Fax:  (202) 418-2822<br><br>Counsel for Respondent Federal<br>Communications Commission | Gregory J. Vogt, PLLC<br>Law Offices of Gregory J. Vogt, PLLC<br>103 Black Mountain Ave.<br>Suite 11<br>Black Mountain, NC 28711<br>Phone:  (828) 669-2099<br><br>Counsel for the National Exchange Carrier<br>Association, Inc. |
| Keith M. Krom<br>AT&T Services, Inc.<br>1120 20th Street, N.W.<br>Washington, D.C. 20036<br>Phone:  (202) 463-4148<br><br>Counsel for AT&T Services, Inc. | |

February 3, 2017

/s/ John F. Cooney
John F. Cooney
Ian D. Volner
Jamie Barnett
Stephen R. Freeland
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004
jfcooney@venable.com

Federal Communications Commission      FCC 16-166

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| AT&T Application for Review; Sandwich Isles | )      WC Docket No. 09-133 |
| Communications, Inc. Petition for Declaratory | ) |
| Ruling | ) |

## MEMORANDUM OPINION AND ORDER

Adopted: December 5, 2016                                      Released: December 5, 2016

By the Commission: Commissioner O'Rielly approving in part and concurring in part.

## I.      INTRODUCTION

1.      In this Memorandum Opinion and Order (Order), we address an Application for Review (Application or AFR) filed by AT&T Inc. (AT&T) and a Petition for Reconsideration (SIC Petition) filed by Sandwich Isles Communications, Inc. (SIC or Sandwich Isles) regarding the Wireline Competition Bureau's (Bureau) *Declaratory Ruling* in the above-captioned proceeding.[1]  In the *Declaratory Ruling*, the Bureau concluded, based on equitable considerations, that certain disputed Paniolo, LLC (Paniolo) undersea cable lease expenses should be included in SIC's revenue requirement for recovery through the NECA pooling process.[2]  For the reasons discussed below, we review the Bureau's findings about the Paniolo lease costs and find that the Bureau's equitable conclusions in the *Declaratory Ruling* were based on predictive judgments and as such should have provided for a timely review of the reasonableness of such predictive judgments and equities.  We further review the underlying predictive judgments and continued equities and determine they do not support continued inclusion of the disputed Paniolo lease expenses in SIC's revenue requirement.  We thus grant AT&T's Application on a prospective basis and to the extent discussed herein.  Additionally, we deny the SIC Petition.

## II.      BACKGROUND

2.      Sandwich Isles provides telephone service to a study area consisting of most of the Hawaiian Home Lands (HHL),[3] and functions as an incumbent local exchange carrier (incumbent LEC)

---

[1] *Sandwich Isles Communications, Inc. Petition for Declaratory Ruling,* WC Docket No. 09-133, Declaratory Ruling, 25 FCC Rcd 13647 (WCB 2010) (*Declaratory Ruling*). *See also* Petition for Reconsideration of Sandwich Isles Communications, Inc., WC Docket No. 09-133 (filed Oct. 29, 2010) (Sandwich Isles Petition) (SIC filed a public version of its Petition on Nov. 3, 2010); Application for Review of AT&T Inc., WC Docket No. 09-133 (filed Oct. 28, 2010) (AT&T Application or AFR).

[2] NECA is an intra-industry, not-for-profit corporation charged by the Federal Communications Commission (FCC or Commission) with administering the Commission's interstate access charge system and associated revenue pools. *See Declaratory Ruling,* 25 FCC Rcd at 13647 n.1.  The NECA pooling process is an averaging mechanism that calculates rates for small carriers based on the revenue, demand, and cost data reported by member companies.  NECA 2009 Comments at 5.  On February 6, 2015, NECA filed an Application for Review, which remains pending. *See* Petition of NECA for Clarification and/or Declaratory Ruling, WC Docket No. 09-133 (filed Feb. 6, 2015) (NECA Petition).

[3] *Declaratory Ruling,* 25 FCC Rcd at 13647 n.3.  The HHL, created by Congress in 1921 for the benefit of native Hawaiians, consists of a total of 203,000 acres in 70 non-contiguous areas.  Ninety-eight percent of this area, which

Federal Communications Commission    FCC 16-166

for access charge and universal service purposes, serving approximately 2000 lines.[4]  On February 3, 1998, the Common Carrier Bureau (Bureau) granted SIC a waiver of Section 36.611 of the Commission's rules,[5] allowing it to receive high-cost loop support based on projected costs,[6] and waived certain incumbent LEC requirements to permit SIC to become a member of the NECA pool.[7]  Sandwich Isles also filed a study area waiver petition, which the Bureau granted for those areas of the HHL that it found were unserved by GTE.[8]

      3.      Sandwich Isles planned to use funding from the Rural Utilities Service (RUS) to finance construction of the completion of a terrestrial underground fiber network.[9]  However, RUS subsequently rescinded its loan approval, and SIC sought alternative financing.[10]  In 2007, SIC informed NECA that it was considering a finance lease arrangement with a third party, Paniolo, that would obtain financing to build an undersea, inter-island network that would be leased to SIC.[11]  In addition, SIC advised NECA of its intention to include new cable lease costs in its NECA cost submissions.[12]  Sandwich Isles ultimately

---

is spread out over the six major islands of Hawaii, is rural.  SIC is licensed by the Department of Hawaiian Home Lands and is subject to regulation by the Hawaii Public Utilities Commission (HPUC).  *Id.*

[4] *See Declaratory Ruling*, 25 FCC Rcd at 13647, para. 2.  In its refreshed comments, SIC asserts that it has "already installed nearly 1,200 access lines in 20 new communities across the HHL."  SIC Refresh Comments at 11-12.

[5] Section 36.611 of the Commission's rules does not exist today, although it did exist when the waiver was granted in 1998.  This rule was supplanted by subpart M of Part 54, as part of the Commission's ongoing Universal Service Fund reforms.  *See Connect America Fund, Universal Service Reform et al.*, Report and Order, Declaratory Ruling, Order, Memorandum Opinion and Order and Seventh Order on Reconsideration, WC Docket Nos. 10-90 et al., 29 FCC Rcd. 7051, 7069, para. 58 (2014).

[6] *See Sandwich Isles Communications, Inc., Petition for Waiver of Section 36.611 of the Commission's Rules and Request for Clarification*, AAD 97-82, Order, 13 FCC Rcd 2407, 2411, para. 11 (CCB 1998) (*High Cost Loop Waiver Order*).  An Application for Review was granted of the *High Cost Loop Waiver Order*. *GTE Hawaiian Telephone Company, Inc., Application for Review of a Decision by the Common Carrier Bureau et al.*, AAD 97-82, Memorandum Opinion and Order, 19 FCC Rcd 22268 (2004).  Sandwich Isles filed a waiver petition based on that Order, which was granted in 2005.  *See Sandwich Isles Communications, Inc., Petition for Waiver of the Definition of "Study Area" Contained in Part 36 et al*, CC Docket No. 96-45, Order, 20 FCC Rcd 8999 (WCB 2005) (*Study Area Waiver Order*).

[7] *See High Cost Loop Waiver Order*, 13 FCC Rcd at 2413, para. 15.  The Common Carrier Bureau became the Wireline Competition Bureau in 2002 as part of organizational changes at the Commission.  *See generally Establishment of the Media Bureau, the Wireline Competition Bureau and the Consumer and Governmental Affairs Bureau*, Order, 17 FCC Rcd 4672 (2002).  *See also Declaratory Ruling*, 25 FCC Rcd at 13648 n.12.  The term "Bureau" in this order refers to the Common Carrier Bureau prior to the reorganization, and to the Wireline Competition Bureau after the reorganization.

[8] *See Study Area Waiver Order*, 20 FCC Rcd at 8999-9000, para. 1.  On June 15, 2005, Hawaiian Telcom filed an application for review of the Bureau's study area order, which remains pending.  Hawaiian Telcom Communications, Inc. Application for Review, CC Docket No. 96-45 (filed June 15, 2005); *see also Declaratory Ruling*, 25 FCC Rcd at 13648 n.13.

[9] *See Study Area Waiver Order*, 20 FCC Rcd at 9004, para. 11.

[10] *See Declaratory Ruling*, 25 FCC Rcd at 13648, para. 4.

[11] *See id.* at 13648, para. 5.  The Paniolo cable network "is approximately a 358 mile undersea and overland fiber optic cable system linking the islands of Kauai, Oahu, Molokai, Maui and Hawaii in the State of Hawaii.  The Paniolo network consists of four (4) Undersea Components and six (6) Overland Components, including but not limited to beach landings, terminal buildings and central office electronics."  *See* SIC 2009 Comments at 17.

[12] *See Declaratory Ruling*, 25 FCC Rcd at 13648-49, para. 5; *see also* NECA 2009 Comments at 9.  NECA and SIC discussed a number of factors bearing on the extent to which the lease payments could be included in the cost study. *See* NECA 2009 Comments at 9; *see also* SIC 2009 Comments at 6.

entered into the lease agreement with Paniolo, with lease costs set at an initial rate of $15 million annually.[13]

    4.    In 2008 NECA informed SIC that it had "serious concerns about the amount of the proposed costs and request[ed] specific details of the proposed cable system" that SIC submitted.[14] NECA notified SIC in 2009 that the costs for the undersea cable transaction "do not appear to meet the standards of the 'used and useful' doctrine"[15] and that NECA might not accept SIC's proposed costs in the upcoming tariff filing or for pool reporting.[16] In 2009, NECA formally notified SIC by letter of its decision not to include the disputed lease costs in SIC's revenue requirement for the upcoming tariff filing or for NECA pool reporting.[17] NECA held that SIC could continue to recover the $1.9 million annual expense it was previously paying to lease voice grade capacity on one of the three existing cables that already served the Hawaiian Islands.[18]

    5.    In response, SIC filed a petition in 2009 requesting that the Commission issue a declaratory ruling that certain circuit lease expenses incurred by SIC for the inter-island submarine cable system are "used and useful."[19] Sandwich Isles also requested that the Commission direct NECA to accept all of the lease costs for inclusion in, and settlement from, its traffic-sensitive pool.[20]

    6.    On September 29, 2010, the Bureau issued the *Declaratory Ruling*.[21] The Bureau disagreed with both SIC's assertion that 100 percent of its lease costs should be recoverable in the NECA pool, and with NECA's determination that only $1.9 million should be recoverable.[22] Instead, the Bureau held that due to the "unique facts and circumstances at issue," it would analyze "equitable factors beyond current usage in evaluating the costs that are 'used and useful' and appropriate for inclusion in the revenue requirements."[23] The Bureau held that, based on the equitable factors of the unique geographic

---

[13] *See, e.g.,* Letter from Megan Strand, Counsel to Sandwich Isles, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-133, Attach. at 11, White Paper of Sandwich Isles Communications, Inc. in Support of Inclusion of its Undersea Cable Costs in the NECA Pool (filed June 4, 2010) (SIC White Paper). These base lease costs increase over time, *see id.* at 12, and SIC is also responsible under the lease for maintenance and insurance costs. SIC 2009 Comments at 17; *see also* Letter from Dana Frix, Counsel to Sandwich Isles, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-133 at 1 (filed Aug. 27, 2010) (discussing engineering, operating, and maintenance costs associated with the Paniolo cable network).

[14] *See Declaratory Ruling,* 25 FCC Rcd at 13649, para. 6; NECA 2009 Comments at 10; SIC 2009 Comments at 7.

[15] SIC 2009 Comments at 7-8.

[16] *Declaratory Ruling,* 25 FCC Rcd at 13649, para. 8; *see also* SIC 2010 Reply Comments at 4; NECA 2009 Comments at 11.

[17] *Declaratory Ruling,* 25 FCC Rcd at 13649, para. 7; *see also* NECA 2009 Comments at 12.

[18] *See Declaratory Ruling,* 25 FCC Rcd at 13654-55, para. 18.

[19] *See* Petition for Declaratory Ruling of Sandwich Isles Communications, Inc., WC Docket No. 09-133, at 1 (filed June 26, 2009) (Petition for Declaratory Ruling); *see also Comments Sought on Petition for Declaratory Ruling of Sandwich Isles Communications, Inc.,* WC Docket No. 09-133, Public Notice, 24 FCC Rcd 9386 (WCB 2009). The "used and useful" standard provides the foundation of Commission decisions evaluating whether particular investments can be included in a carrier's revenue requirement. Property is considered "used and useful" for regulatory ratemaking if it is "necessary to the efficient conduct of a utility's business, presently or within a reasonable future period." *Declaratory Ruling,* 25 FCC Rcd at 13651-52, para. 12 & n.36 (citing *American Tel. and Tel. Co.*, Phase II Final Decision and Order, 64 FCC 2d 1, 38, para. 111 (1977) (*AT&T Phase II Order*)).

[20] *See* Petition for Declaratory Ruling at 1.

[21] *Declaratory Ruling,* 25 FCC Rcd 13647.

[22] *Id.* at 13650, para. 9.

[23] *Id.* at 13650, para. 9.

conditions of Hawaii, demand predictions, the special role that SIC plays in providing telecommunications services to rural areas of Hawaii, and the general permissibility of including reasonable spare capacity in the revenue requirement, SIC was allowed to include 50 percent of its disputed lease expenses in its revenue requirement for the NECA pool, as well as certain other expenses.[24]

7.      Several parties requested review of the *Declaratory Ruling*. SIC filed a Petition for Reconsideration of the *Declaratory Ruling*, asserting that it was entitled to receive 100 percent of the disputed costs.[25] AT&T filed an Application for Review of the *Declaratory Ruling*, asserting that the equitable considerations relied on in the *Declaratory Ruling* were not valid and should all be reconsidered and reversed.[26] And in 2015 NECA filed a Petition for Clarification and/or Declaratory Ruling, asserting that SIC has made only partial lease payments while receiving pooling payments in accordance with the terms of the *Declaratory Ruling*.[27] NECA requests that the Commission clarify that such lease expenses must be paid during the relevant carrier accounting cycle and authorize NECA to adjust SIC's pool settlements during the relevant period.[28] The Bureau issued public notices seeking comment on these Petitions and the Application.[29]

8.      On March 29, 2016, the Bureau released a public notice seeking to refresh the record and stated that, based on numerous *ex parte* meetings and filings, "new or changed facts and circumstances…may be relevant to the Commission's consideration" of issues in this docket.[30] Several parties filed comments.[31] In its comments, SIC asserts that it has "renegotiated" its Paniolo lease costs, reducing the costs from approximately $24 million to $8.1 million annually.[32] Sandwich Isles contends this restructured lease payment will reduce its annual pool cost recovery and requests the Bureau dismiss the pending Application and NECA Petition in this docket and direct NECA to accept its entire renegotiated lease amount for cost recovery.[33] AT&T, NECA, and USTelecom disagree with SIC's request.[34] AT&T reasserts its earlier position that the equitable considerations relied on in the *Declaratory Ruling* are not valid and should be reconsidered.[35] NECA states that SIC has not established

---

[24] *Id.* at 13654-59, paras. 17-23.

[25] *See* SIC Petition at 1, 7.

[26] *See* AT&T Application.

[27] *See* NECA Petition.

[28] NECA Petition at 10-11.

[29] *See Comments Sought on AT&T Application for Review and Sandwich Isles Petition for Reconsideration*, WC Docket No. 09-133, Public Notice, 25 FCC Rcd 15589 (WCB 2010) (*2010 Public Notice*). Several parties filed comments. *See also Wireline Competition Bureau Seeks Comment on NECA's Petition for Clarification and/or Declaratory Ruling re: Sandwich Isles Declaratory Ruling*, WC Docket No. 09-133, Public Notice, 30 FCC Rcd 1164 (WCB 2015) (*2015 Public Notice*).

[30] *See Wireline Competition Bureau Seeks to Refresh Record in WC Docket No. 09-133 and Seeks Comment on AT&T Application for Review, Sandwich Isles Petition for Reconsideration, and NECA Petition for Clarification and/or Declaratory Ruling*, WC Docket No. 09-133, Public Notice, 31 FCC Rcd 2204 (WCB Mar. 29, 2016) (*2016 Public Notice*).

[31] *See* AT&T Refresh and Reply Comments, NECA Refresh and Reply Comments, SIC Refresh and Reply Comments, as well as Refresh Comments from the Sovereign Councils of the Hawaiian Homelands Assembly (SCHHA) and USTelecom.

[32] SIC Refresh Comments at 29-31; AT&T Refresh Reply at 3.

[33] SIC Refresh Comments at 5, 30.

[34] *See* AT&T Refresh Comments at 1-5 and Refresh Reply at 3-4; NECA Refresh Reply at 1-2, 11-14; USTelecom Refresh Comments at 2-3.

[35] AT&T Refresh Comments at 1-5.

Federal Communications Commission                                    FCC 16-166

that its Paniolo lease costs are used and useful and reiterates its earlier concern that SIC has not paid the full amount of its lease in several years.[36] NECA further asserts that SIC has not provided any support or justification for its "renegotiated" lease and that a lease payment reduction does not allow SIC to recover more than the amounts determined in the *Declaratory Ruling*.[37]

## III.    DISCUSSION

9.      In this Order we grant AT&T's Application to the extent discussed below.  We conclude that the Bureau erred in its failure to provide for a timely review of the reasonableness of its predictive judgments and, based on the current record, conclude that the equities do not support continued inclusion of the disputed Paniolo lease expenses in SIC's revenue requirement.  Based on the updated record now before us, we determine that the predictive judgments made by the Bureau in 2010 did not accurately foretell future developments and thus do not support continued reliance on the equitable factors used to justify the decision allowing SIC to include 50 percent of the disputed lease costs in its revenue requirement.  We therefore direct NECA to discontinue payment of the disputed amounts and to cease allowing SIC to include 50 percent of the disputed lease costs of the Paniolo cable lease expenses, as well as certain other expenses in its revenue requirement.  Finally, we deny SIC's Petition.[38]

### A.    Application of the Used and Useful Standard

10.     In the *Declaratory Ruling*, the Bureau noted that the used and useful standard "provides the foundation of Commission decisions evaluating whether particular investments can be included in a carrier's revenue requirements" for inclusion in the NECA pool.[39]  Property is considered used and useful if it is "'necessary to the efficient conduct of a utility's business, presently or within a reasonable future period.'"[40]  Although the Commission has identified general principles regarding what constitutes "used and useful" investment to be included in a carrier's revenue requirement, it has recognized "that these guidelines are general and subject to modification, addition or deletion.  The particular facts of each case must be ascertained in order to determine what part of a utility's investment is used and useful."[41]  Relevant considerations under the used and useful standard are: 1) the need to compensate the investor for capital devoted to serving ratepayers; 2) the need to charge ratepayers for only those investments which benefit them; and 3) the need for such benefit to be either immediate or realized within a reasonable future period of time.[42]

11.     In discussing the need for such benefit to be either immediate or realized within a reasonable future period of time, the Bureau noted that the Commission has flexibility in considering

---

[36] NECA Refresh Comments at iii; NECA Refresh Reply at 2-9.

[37] NECA Refresh Reply at 11-14; AT&T Refresh Reply at 3-5.

[38] To facilitate coordinated resolution of the SIC Petition and the AT&T Application, the Bureau, as permitted by section 1.104(b) of the Commission's rules, referred consideration of the petition to the Commission.  *See* 47 CFR § 1.104(b); *see also, e.g., Jose M Oti, D/B/A Sandino Telecasters for Termination of Authorization of Angeles Broadcasting Network, Interim Licensee of Station KAGL (TV), San Bernardino, California,* FCC 93-173, Memorandum Opinion and Order, 8 FCC Rcd 2573 (1993) (petition referred to the Commission pursuant to section 1.104(b) of the Commission's rules); *Florida Cellular Mobil Communications Corporation,* File No. 10854-CL-P-468-A-89, Memorandum Opinion and Order, 6 FCC Rcd 6910 n.1 (1991) (similar).

[39] *Declaratory Ruling,* 25 FCC Rcd at 13651-52, para. 12.

[40] *Id.* at 13651-52, para. 12, quoting *AT&T Phase II Order,* 64 FCC 2d at 38, para. 111.

[41] *Declaratory Ruling,* 25 FCC Rcd at 13651-52, para. 12 n. 41, citing *AT&T Phase II Order,* 64 FCC 2d at 39, para. 115.

[42] *Declaratory Ruling,* 25 FCC Rcd at 13651-52, para. 12, citing *AT&T Phase II Order,* 64 FCC 2d at 38, paras. 111-12.

what constitutes a "reasonable time."[43]  Plant currently used for the provision of regulated services generally is recognized as being used and useful.[44]  Plant that "is not currently used and useful, however, is excess capacity."[45]  In prior cases, the Commission has considered inclusion of costs for plant not currently in use for the provision of regulated services, such as excess capacity, as "used and useful" based on equitable considerations.[46]

12.    In adopting rules to govern cable rate regulation in 1996, the Commission allowed inclusion of costs only for fully constructed plant that would be used to provide regulated service within 12 months, although it did not appear to have so limited the inclusion of costs related to other services.[47]  In the *AT&T Phase II Order*, the Commission stated that the question of what length of time constitutes "the near future" for purposes of determining whether investment is "used and useful" "has no strict, economically sound answer," and "is thus subject to Commission judgment and discretion, and depends upon the particular circumstances of each case."[48]  The Commission also stated that the phrase

'presently or within a reasonable future period' in the denotation of 'used and useful' is included to protect ratepayers from being forced to pay a return on investment which may not be used for a considerable length of time or is not needed to serve as a reserve for currently used investment. The question of what length of time constitutes 'the near future' has no strict, economically sound answer.[49]

13.    The Commission has also allowed costs to be included in the revenue requirement to "address inequities or avoid complications and burdens."[50]  The Commission has stated that "[t]he question of what property falls within the definition of used and useful has no rigid, economic answer and depends upon the balance of equities in each situation."[51]  In the *Declaratory Ruling*, the Bureau noted that the "Commission has flexibility itself to consider a variety of equitable factors beyond current actual usage in evaluating the costs that are 'used and useful' and appropriate for inclusion in the revenue requirement."[52]

14.    In keeping with precedent, the Bureau held in the *Declaratory Ruling* that it should consider issues such as excess capacity in the Paniolo network through an analysis of equitable considerations.[53]  The Bureau balanced "the current lack of use of the cable and a lack of substantial record evidence concerning future demand" against the "countervailing factors" of "the unique

---

[43] *Declaratory Ruling*, 25 FCC Rcd at 13656-57, para. 22.

[44] *Id.* at 13652-53, para. 13.

[45] *Id.* at 13652, para. 13 (internal citations omitted).

[46] *Id.* at 13652, para. 14.

[47] *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation; Adoption of a Uniform Accounting System for Provision of Regulated Cable Service*, MM Docket No. 93-215, Second Report and Order, First Order on Reconsideration, and Further Notice of Proposed Rulemaking, 11 FCC Rcd 2220, 2235-36, para. 33 (1996).

[48] *AT&T Phase II Order*, 64 FCC 2d at 38, para. 113; *see also Declaratory Ruling*, 25 FCC Rcd at 13652-53 n.43.

[49] *AT&T Phase II Order*, 64 FCC 2d at 38, para 113.

[50] *Declaratory Ruling*, 25 FCC Rcd at 13653-54, paras. 14, 16.

[51] *Declaratory Ruling*, 25 FCC Rcd at 13653, para. 14, citing *Investigation of Special Access Tariffs of Local Exchange Carriers*, CC Docket No. 85-166, Memorandum Opinion and Order, FCC 86-52 at para. 37 (Jan. 24, 1986), 1986 WL 291617 (subsequent history omitted) (*Phase I Special Access Tariffs Investigation Order*).

[52] *Declaratory Ruling*, 25 FCC Rcd at 13650, para. 9.

[53] *Id.* at 13650, para. 9.

Federal Communications Commission                        FCC 16-166

geographic conditions in Hawaii, the special role that Sandwich Isles plays in providing telecommunications services to rural areas of Hawaii, and the ability to include some spare capacity in the revenue requirement."[54] Balancing these equities, the Bureau allowed SIC to include 50 percent of the disputed lease costs in its revenue requirement, in addition to the $1.9 million a year that was allowed, "approximating the amount that [Sandwich Isles] was previously paying . . . to lease voice grade capacity" on another undersea cable.[55] The Bureau also noted that SIC specified that some future demand was likely to come from unregulated services or services provided to other carriers under contract.[56]

### B.  Authority to Review Declaratory Ruling

15.      In the *Declaratory Ruling*, the Bureau considered the unique geographic challenges in Hawaii.[57] And, based on the difficulty of repairing submarine cable, the Bureau predicted that the Paniolo cable would be used to assist other providers on an emergency basis in the future, as it had in the past.[58] The Bureau also considered the special role of Sandwich Isles and made a predictive judgment that Sandwich Isles would bring advanced and improved services to underserved areas of the Hawaiian Home Lands.[59] The Bureau relied on predictive judgments and expected, based on SIC's representations and other record evidence,[60] that Sandwich Isles would: use its excess capacity to assist with cable outages; offer improved and advanced services to underserved areas in Hawaii; deploy its spare capacity as demand for its services grew; and add subscribers as well as lease available capacity to other providers.[61]

16.      In its Application, AT&T disputes the Bureau's consideration of these equitable factors and also raises questions about the Bureau's decisions and predictions. For example, AT&T asserts that the Paniolo cable was never used on an emergency basis and notes that multiple other cable providers offer service in the same area.[62] AT&T also asserts that consideration of spare capacity should account for current services and subscribers.[63] AT&T and NECA assert further that "new facts and…changed circumstances…have become evident since the *Declaratory Ruling* was issued" and that such changed circumstances warrant a review of the *Declaratory Ruling*.[64]

17.      In this case, we find that it is in the public interest to reexamine the Bureau's decision in light of an updated record. Indeed, some of the equitable factors considered by the Bureau in 2010, e.g., anticipated demand, are predictive or future-oriented, and therefore are inherently subject to later reevaluation based on changed circumstances. Therefore we determine that, due to the forward-looking

---

[54] *Id.* at 13654, para. 17.

[55] *Id.* at 13654-55, para. 18.

[56] *Id.* at 13659, para. 23.

[57] *Id.* at 13654-55, para. 19 ("As Sandwich Isles observes, improved route diversity historically has been viewed as a factor supporting the deployment of submarine cable, and is an equitable consideration that we find particularly important in an area like Hawaii, given, for example, the depth of the ocean and associated difficulty of repairs.").

[58] *See id.*

[59] *Declaratory Ruling*, 25 FCC Rcd at 13655-56, para. 20.

[60] *See, e.g.*, GVNW 2009 Comments at 14; Letter from Kaulana H.R. Park, Chairman, Hawaiian Homes Commission, Department of Hawaiian Home Lands, to Chairman Julius Genachowski, FCC, WC Docket No. 09-133, at 1-2 (filed Sept. 15, 2009).

[61] *See Declaratory Ruling*, 25 FCC Rcd at 13654-59, paras. 19-23.

[62] *See* AT&T Application at 2-3.

[63] *See* AT&T Application at 10-12.

[64] *See* AT&T Refresh Comments at 5 ("without the equitable underpinnings, the Declaratory Ruling is no longer justified"); NECA Refresh Comments at v ("the application of the equitable factors should be reconsidered in light of the actual facts that have taken place since the Ruling was issued").

Federal Communications Commission                    FCC 16-166

nature of the equitable factors used in the *Declaratory Ruling*, the Bureau erred in not providing for a timely review of the reasonableness of such predictive judgments and the equities. Specifically, the Bureau could have held that it would in a defined period reassess whether its predictions had borne out and continue to justify its finding that 50 percent of the Paniolo lease costs remain used and useful. We review the comments and the updated record and for the reasons discussed below, find that the Bureau erred in not imposing a time limitation on its conclusions.

### C.    AT&T Application for Review

18.    In its Application, AT&T claims that none of the equitable factors used in the *Declaratory Ruling* justified the Bureau's departure from NECA's initial determinations under the used and useful standard to exclude all lease costs above those ascertainable as equivalent to leasing cable from another provider.[65] NECA and USTelecom agree and support AT&T's Application.[66]

19.    AT&T asserts that "because Sandwich Isles failed to demonstrate *any* present or future *telephone* service need for the Paniolo cable, the $15 million annual expense associated with that cable is neither 'used and useful' nor 'prudent investment.'"[67] NECA notes that while it "does not take any position on the equitable factors adopted in the Bureau's *Declaratory Ruling*, the application of the equitable factors should be reconsidered in light of the actual facts that have taken place since the Ruling was issued."[68] USTelecom asserts that "the 'equitable' considerations that WCB relied upon in its Declaratory Ruling were based on incorrect facts."[69] Sandwich Isles disagrees and contends that both AT&T and NECA "grossly oversimplify--and thereby misstate--the purpose and nature of the 'used and useful' analysis."[70] Sandwich Isles claims that the *Declaratory Ruling* misapplied the used and useful standard because the decision to include only 50 percent of the Paniolo lease expense in its revenue requirement led to an inequitable and unjust result.[71]

20.    The Commission has considerable discretion under the used and useful standard and "these guidelines are general and subject to modification, addition or deletion."[72] The inclusion of costs related to the Paniolo cable were appropriate in light of "the current lack of use of the cable and a lack of substantial record evidence concerning future demand," as well as "a number of countervailing factors, including the unique geographic conditions in Hawaii, the special role that Sandwich Isles plays in providing telecommunications services to rural areas of Hawaii, and the ability to include some spare capacity in the revenue requirement."[73] We find that the commenters' assertions regarding the used and useful standard are arguments about the specific application of equitable factors or changed circumstances, and discuss them as such below.

---

[65] AT&T Application at 5.

[66] *See* NECA Refresh Comments at v, 15 (noting that while it "does not take any position on the equitable factors adopted in the Bureau's Declaratory Ruling, the application of the equitable factors should be reconsidered in light of the actual facts that have taken place since the Ruling was issued"); USTelecom Refresh Comments at 3 ("the 'equitable' considerations that WCB relied upon in its Declaratory Ruling were based on incorrect facts").

[67] AT&T Application at 1 (emphasis in original).

[68] *See* NECA Refresh Comments at v (noting that while it "does not take any position on the equitable factors adopted in the Bureau's Declaratory Ruling, the application of the equitable factors should be reconsidered in light of the actual facts that have taken place since the Ruling was issued").

[69] USTelecom Refresh Comments at 3.

[70] SIC Refresh Comments at 21.

[71] SIC Petition at 23.

[72] *Declaratory Ruling*, 25 FCC Rcd at 13652-53 n. 41, citing *AT&T Phase II Order*, 64 FCC 2d at 39, para. 115.

[73] *Declaratory Ruling*, 25 FCC Rcd at 13654, para. 17.

### 1. Consideration of Equitable Factors

21.     We conclude that it is in the public interest to reexamine the equities relied upon by the Bureau. In light of the updated record, we determine that the predictive judgments based on the equitable factors have turned out to be inaccurate.

22.     Several commenters assert that material facts have changed regarding SIC and the Paniolo cable network since the issuance of the *Declaratory Ruling*, and urge the Commission to reconsider the equitable and other conclusions reached in the *Declaratory Ruling*. AT&T asserts that "the facts have indeed changed and those changed facts directly affect the equities the Commission relied upon in allowing Sandwich Isles to recover the costs of the Paniolo cable."[74] AT&T notes the criminal conviction of the former president of SIC as well as the suspension of High Cost Program support to Sandwich Isles, and asserts that Sandwich Isles "has been found to have unclean hands-and no longer is deserving of any equitable benefit of doubt."[75]

23.     NECA states that "the application of the equitable factors should be reconsidered in light of the actual facts that have taken place" since the issuance of the *Declaratory Ruling*.[76] NECA also specifies that "the current facts continue to fail to meet the second (benefit to ratepayer) and third (reasonable time) prongs of the used and useful doctrine, just as they did in 2009."[77] NECA states that its initial decision to deny certain lease costs based on the used and useful standard was based on "then-current facts,"[78] and that even with a refreshed record, it "has no basis to change its previous conclusion that the Paniolo cable system lease costs are not used and useful."[79] NECA also contends that it asked SIC to provide it with updated facts pertaining to a used and useful analysis but SIC has not done so.[80] USTelecom strongly supports AT&T's Application and asserts that the Commission should account for the recent criminal conviction of the principal associated with SIC's parent company, as well as SIC's failure to make lease payments according to the terms of its lease in its analysis.[81] USTelecom argues further that the equitable considerations relied upon by the Bureau in the *Declaratory Ruling* were based on incorrect facts.[82]

24.     Sandwich Isles asserts that

> the issue before the Bureau today is exactly the same as the issue before the Bureau in 2010 when the decision was issued: it is beyond question that SIC's lease costs for the Paniolo Cable network are eligible for cost recovery from the NECA pool; the only question is the proper method for computing the level of and the amount of that cost recovery.[83]

---

[74] AT&T Refresh Comments at 2.

[75] AT&T Refresh Comments at 2-5. We do not make a determination about AT&T's assertion that Sandwich Isles has "unclean hands" and is no longer "deserving of any equitable benefit of doubt." *Id.* at 5. We grant AT&T's Application on the other grounds detailed herein and therefore do not need to reach this argument.

[76] NECA Refresh Comments at v.

[77] *Id.* at 20.

[78] *Id.* at iii, 19-20.

[79] *Id.* at iv.

[80] NECA Refresh Comments at iii, 15.

[81] USTelecom Refresh Comments at 2-3.

[82] *Id.* at 3.

[83] SIC Refresh Comments at 4.

Federal Communications Commission    FCC 16-166

25.      We agree with those commenters who assert that factual developments placed into the record since 2010 demonstrate that the predictions that underlay the equitable factors have turned out to be erroneous.[84] Based on the updated record we reexamine the equitable factors used in the *Declaratory Ruling*, including certain predictive judgments regarding increased demand and forward-looking assumptions, and find that they have not occurred as predicted.

> a.      **Unique Geographic Challenges in Hawaii**

26.      One of the equitable factors that the Bureau considered in the *Declaratory Ruling* was "the unique telecommunications infrastructure needs arising from…the geographical characteristics of Hawaii…."[85] The Bureau described how providers in Hawaii "rely on submarine cable transmission to connect the various islands that they serve."[86] The Bureau further found that the submarine cable deployed by SIC was particularly important in Hawaii due to "the depth of the ocean and associated difficulty of repairs."[87]

27.      The Bureau also considered route diversity as part of the equitable factors related to the unique geographic challenges in Hawaii.[88] The Bureau noted that "improved route diversity historically has been viewed as a factor supporting the deployment of submarine cable, and is an equitable consideration that we find particularly important in an area like Hawaii…."[89] Additionally, although other submarine cables already served the Hawaiian Islands, the Bureau determined that the Paniolo cable "lands in different places than do the other two cables" and thus enhances route diversity.[90] In weighing the importance of this factor, the Bureau considered that in the future, SIC would be able to use its capacity on an emergency basis, as it had done in the past, to assist other providers in case of service interruptions.[91]

28.      New evidence shows that these predictions have proven to be inaccurate. Commenters assert that other carriers have continued to serve this region concurrently with SIC since the deployment of the Paniolo cable network.[92] AT&T contends that "Sandwich Isles ratepayers…already enjoyed robust route diversity and spare capacity by virtue of the three undersea cables that existed when Sandwich Isles undertook its Paniolo project…."[93] NECA states that "a substantial number of customers in the Hawaiian

---

[84] *See, e.g.*, AT&T Application, AT&T Refresh and Reply Comments, NECA Refresh and Reply Comments.

[85] *Declaratory Ruling*, 25 FCC Rcd at 13654, para. 18.

[86] *Id.* at 13654, para. 19.

[87] *Id.* at 13654, para. 19 & n.55.

[88] *Id.* at 13654-55, para. 19.

[89] *Id.* at 13654, para. 19.

[90] *Id.* at 13655, para. 19 (internal citations omitted).

[91] *Declaratory Ruling*, 25 FCC Rcd at 13654-55, para. 19. SIC's involvement in the Wavecom outage has been disputed. *See* AT&T Application at 3 n.7 (citing Letter from Thomas Lynch, Counsel to Pacific Lightnet dba Wavecom Solutions, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-133 (filed Sept. 23, 2010) (asserting that WaveCom did not use an outside provider during its 2010 outage)).

[92] *See* NECA Refresh Comments at 18-19 (asserting that a substantial number of customers in the HHL continue to receive telecommunications services from Hawaiian Telcom); AT&T Refresh Comments at 6 (asserting that "Hawaiian Telcom, Inc. has represented that it 'is the carrier of last resort for the entire state of Hawaii' and 'that it can and will continue to serve all rural areas of Hawaii, including the Hawaiian Home Lands'") (internal citations omitted); Letter from Gregory J. Vogt, Counsel to Hawaiian Telcom, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90, 05-337 (filed Jan. 16, 2014) (asserting that Hawaiian Telcom is "Hawaii's only statewide provider of last resort").

[93] AT&T Application at 2.

Home Lands continue to receive telecommunications services from Hawaiian Telcom."[94] NECA also contends that "there were two and are now three undersea cable systems serving the Hawaiian Islands" and that "[i]t would have been more reasonable and economical to lease only a portion of the cable. . . ."[95]

29.    AT&T disputes that SIC's cable was used on an emergency basis during out an outage, calling the claim "patently false."[96] AT&T further asserts that "there are and have been multiple cables servicing Hawaii…and the record evidence clearly establishes that there were already 'backup arrangements for all interisland facilities.'"[97] NECA challenges SIC's reliance on two recent cable outages in Hawaii to demonstrate the need for route diversity, arguing that SIC "stops short of stating that the Paniolo cable was actually used during these outages."[98] Verizon contends that "Sandwich Isles admits that the vast majority of capacity on this new cable network is not needed to offer regulated services."[99]

30.    Sandwich Isles responds that the Paniolo cable has "contributed to inter-island route diversity and has been used by other service providers during periods when their networks have been out of service."[100] It asserts that its "cable network now provides essential, redundant and diverse submarine cable capacity for regions of Hawaii that were previously under-served, or completely dark."[101] Sandwich Isles also states that it "has enhanced the quality of service available across the HHL due to its cutting-edge technology and robust back-up capacity."[102] These statements are unsupported in the record.

31.    Based on the updated record, we find that the predictive judgments set forth in the *Declaratory Ruling* that underpin the equitable factor of the unique geographic challenges in Hawaii have not materialized. No evidence exists, since the release of the *Declaratory Ruling*, to demonstrate that the Paniolo cable has been used when other providers' cables were out of service.[103] And, even though SIC reports that its cable lands in different places than pre-existing cable, the record shows that other providers continue to serve the residents of the Hawaiian Home Lands.[104] We thus find that the predictive judgments based on the unique geographic challenges diversity have not occurred.

### b.    Special Role of Sandwich Isles

32.    In the *Declaratory Ruling*, the Bureau found that SIC "serves a unique role in its provision of service to Hawaiian home lands" and was created in response to a Hawaiian law designed to

---

[94] NECA Refresh Comments at 5, 18-19.

[95] *Id.* at 22.

[96] AT&T Application at 3.

[97] *Id.* at 10.

[98] NECA Refresh Reply at 8 n.25. *See also* SIC Refresh Comments at 17-18 & n. 41 ("The two intrastate submarine cable systems serving portions of Hawaii prior to construction of the Paniolo Cable are now both 20+ years old. Predictably, there have already been multiple instances of outages associated with this aging infrastructure. Both of these cables are fast approaching their end of days.").

[99] Verizon 2010 Comments at 3.

[100] SIC Refresh Comments at 7.

[101] SIC Refresh Comments at 20. SIC also asserts that its services "enhance[e] security, public and private," and that Hawaii…is a sensitive location with respect to homeland security issues…the personal security of HHL residents and island-visitors has been served by the Paniolo Cable network." *Id.* at 19-20.

[102] SIC Refresh Comments at 18.

[103] NECA Refresh Reply at n. 25 ("SIC cites two recent cable outages in Hawaii to demonstrate the redundancy need. But SIC stops short of stating that the Paniolo cable was actually used during these outages.") (internal citations omitted).

[104] *See supra* note 92.

Federal Communications Commission    FCC 16-166

improve telecommunications service in rural areas of Hawaii.[105] The Bureau recognized that SIC was created to respond to concerns about the adequacy of communications services provided in certain parts of Hawaii "with the expectation that [it] would offer improved service," including "technological advances over the pre-existing cables."[106] The Bureau also took into account SIC's "special role pursuant to federal and state law," and weighed SIC's "technological advances over the pre-existing cable" in Hawaii as part of its equitable considerations.[107] The Bureau's prediction that SIC would provide advanced services and technology to "areas scattered throughout Hawaii," especially those in the HHL that were underserved, was part of the equitable considerations evaluated when it allowed inclusion of 50 percent of the disputed lease costs in SIC's revenue recovery.[108]

33.    Sandwich Isles states that, via the Paniolo cable, it now "provides essential, redundant and diverse submarine cable capacity for regions of Hawaii that were previously under-served, or completely dark."[109] Sandwich Isles specifies that in certain rural portions of Maui that lack electricity, it is "the singular means by which residents and public safety authorities can exchange critical public safety information."[110] It contends further that it has expanded access to previously unserved areas in Hawaii because the "older, pre-existing cables did not then, and do not now extend access to the areas serviced by the Paniolo Cable...."[111]

34.    Commenters dispute SIC's claim that it is the exclusive provider of advanced telecommunications access in remote, previously-unserved areas parts of the HHL.[112] NECA asserts that SIC's claims regarding the unwillingness of other providers to serve parts of the HHL are "dated history," which predate SIC's commencement of service in 1997.[113] NECA further notes that SIC's claims regarding its necessity for public safety and resident services are neither explained nor supported.[114] NECA disputes SIC's assertion that its service is crucial in rural, unserved parts of Hawaii, stating that such vague claims appear to relate to the capacity of SIC's network as a whole, not just the Paniolo cable in question.[115]

35.    Additionally, commenters disagree with SIC's inclusion of costs in the NECA pool related to building an advanced broadband network. AT&T asserts that in those places in which SIC provides advanced broadband service, its related costs should never have been considered as part of its rate-of-return carrier access charges, which by law are limited to a reasonable return on plant used and

---

[105] *Declaratory Ruling*, 25 FCC Rcd at 13655, para. 20.

[106] *Declaratory Ruling*, 25 FCC Rcd at 13655, para. 20. The Bureau noted, however, that in discussing investment in new technology, "the weight we place on these considerations here derives primarily from the special role served by Sandwich Isles in Hawaii." *Id.* at 9-10 n.65.

[107] *Declaratory Ruling*, 25 FCC Rcd at 13655, para. 20, citing SIC White Paper at 12.

[108] *Id.* at 13655, para. 20.

[109] SIC Refresh Comments at 20.

[110] *Id.* at 20.

[111] *Id.* at 18.

[112] *See supra* note 92.

[113] NECA Refresh Comments at 4-5 & n.11.

[114] *Id.* at 8-9 (asserting that "no explanation of this expansive statement is provided" and that such claim cannot be credited as statement to support the need for SIC subscribers to the Paniolo cable network).

[115] *Id.* at iii, 4-5. AT&T notes that SIC was established to serve underserved, isolated communities within Hawaii and that "this is really a USF issue." AT&T Application at 3-4. AT&T contends that other, explicit subsidies for the provision of advanced services, such as Universal Service Fund support, should be used for such costs.

Federal Communications Commission                    FCC 16-166

useful in the provision of basic telecommunications services.[116]  NECA also states that inclusion of the costs of the entire Paniolo network was and remains unjustified.[117]

36.     Based on the updated record, we find no evidence that the predictive judgments set forth in the *Declaratory Ruling* underlying Sandwich Isles' special role have materialized.  Sandwich Isles does not provide evidence that the Paniolo cable offers "technological advances over the pre-existing cables" in the HHL but merely recycles the same arguments based on predictions of what it would do that it made in support of its 2010 Petition for Declaratory Ruling without demonstrating what has changed or actions it has taken since that time.[118]  Additionally, significant dispute exists in the record regarding SIC's alleged exclusive provision of service to the HHL.[119]  As discussed previously, relevant considerations under the used and useful standard are the need to charge ratepayers for only those investments which benefit them.[120]  Without evidence that Sandwich Isles' customers actually enjoy the benefits of such investments previously predicted, it is not appropriate to continue to rely on this equitable consideration.[121]

### c.     Inclusion of Spare Capacity

37.     In the *Declaratory Ruling*, the Bureau noted that "once the decision was made to deploy the cable...it was logical here to include some spare capacity in the cable, given the relatively small increase in cost...."[122]  The Bureau observed, however, that while "some recovery for spare capacity can be reasonable," NECA had raised substantial questions about whether the capacity in Paniolo's proposed

---

[116] AT&T Application at 3, 11.

[117] NECA Refresh Reply at 2-3.

[118] SIC Refresh Comments at 19-20 (suggesting that the Paniolo cable enhances the quality of service available across the HHL, improves restoration and reliability, extends to areas not previously served and is consistent with government efforts to promote diverse and redundant submarine cable capacity).  *See Declaratory Ruling*, 25 FCC Rcd at 13655, para. 20 (discussing that SIC was created to respond to "concerns about the adequacy of communications services provided in those areas, with the expectation that Sandwich Isles would offer improved service").  The Bureau also noted that the submarine cable includes technological advances over the preexisting cables used in Hawaii). *Id. See also* SIC 2010 Reply Comments at 3 (suggesting that the existing cables were nearing the end of their useful life).

[119] *See, e.g.*, SCHHA Refresh Comments at 2 (asserting that on the island of Molokai, "Hawaiian Telcom bypassed that island's HHL communities in providing Internet services" and that "[a]s recently as six years ago, our Molokai families were still using antiquated dial-up modem service if they wanted Internet service at all"); SIC Refresh Comments at 3.  *Contra* Verizon 2010 Comments at 3 (asserting that the SIC cable network is 'duplicative of four other undersea cables serving the Hawaiian Islands"); AT&T Refresh Comments at 6 (asserting that Hawaiian Telcom has represented that it is "the carrier of last resort for the entire state of Hawaii" and that "it can be and will continue to serve all rural areas of Hawaii, including the Hawaiian Home Lands")(internal citations omitted); NECA Refresh Reply at 4 n.11 (asserting that SIC's claim of exclusivity is "dated history" and that the Molokai area has been served by another provider via an interisland cable since 2000); NECA Refresh Reply at 5 n.13 (asserting that, despite SIC's claim that it has exclusive rights to serve customers in the HHL service territory, "Hawaiian Telcom serves a significant number of HHL residents today").  In 2013 the issue of SIC's alleged exclusivity of service was considered by the Bureau as part of in its consideration of certain high-cost universal service support, but the issue was not resolved.  *See Connect America Fund, Sandwich Isles Communications, Inc., Petition for Waiver of Section 54.302 of the Commission's Rules*, WC Docket No. 10-90, Order, 28 FCC Rcd 6553, 6556-57, paras. 8-9 (WCB 2013).

[120] *Declaratory Ruling*, 25 FCC Rcd at 13651-51, para. 12, citing *AT&T Phase II Order*, 64 FCC 2d at 38, para. 112.

[121] We discuss below the incorrect prediction that demand for Sandwich Isles' services, and thus the Paniolo cable, would increase following the release of the *Declaratory Ruling*.  *See infra* paras. 41-44.

[122] *Declaratory Ruling*, 25 FCC Rcd at 13656, para. 21.

13

lease was "necessary to serve Sandwich Isles' reasonably foreseeable demand for regulated services."[123] The Bureau also found that, while not determining the specific issue of whether SIC's cable was "prudently incurred,"[124] "the record [did] suggest some promise" regarding future increased use of the cable's capacity.[125] The Bureau held that it did not want to "deter other carriers from deploying spare capacity in the future" by "unduly limiting cost recovery solely to the percentage of capacity actually used" by SIC at that time.[126]

38.     AT&T urges reconsideration of this equitable factor, stating that "the record overwhelmingly demonstrated that there was more than sufficient spare capacity on existing cable" and that the "Paniolo cable was not needed to provide either current services or spare capacity."[127] NECA agrees, asserting that "the cost and the capacity of the Paniolo cable system are far in excess of what is reasonably required to service SIC broadband customers from 2010 through the near future."[128] NECA asserts that the *Declaratory Ruling* cast doubt on SIC's number of expected subscribers, based on HHL's goal of new housing for up to 20,000 native residents, and that this projected new construction still has not occurred.[129]

39.     Sandwich Isles asserts that it constructed the Paniolo network due to the condition of existing infrastructure.[130] This is not a new argument.[131] Sandwich Isles argues further that "excess capacity represented a minor, incremental cost – particularly relative to the scale of the project – and did not materially affect the cost of construction."[132]

40.     Whether or not it was "logical here to include some spare capacity in the cable" at the time of the *Declaratory Ruling's* adoption, the used and useful standard requires that the benefit from an investment must be realized within a reasonable period of time, and that ratepayers not be forced to subsidize services that they do not enjoy.[133] That has not happened here. As discussed in this Order, no evidence exists that the spare capacity allowed pursuant to the equitable factors in the *Declaratory Ruling* has been needed or utilized since its adoption.[134] Sandwich Isles has provided no evidence to the contrary; rather, in recent comments, it has again presented only predictions that its excess capacity will be used in the future.[135] The Bureau should have provided for a timely review of the reasonableness of

---

[123] *Declaratory Ruling*, 25 FCC Rcd at 13656, para. 21 (internal citations omitted). The Bureau also noted that SIC had "an obligation and responsibility" to account for the different in use between its regulated and nonregulated services. *Id.* at n.67.

[124] *Declaratory Ruling*, 25 FCC Rcd at 13656-57, para. 22 n.70.

[125] *Declaratory Ruling*, 25 FCC Rcd at 13656-57, para 22 n.77.

[126] *Declaratory Ruling*, 25 FCC Rcd at 13656, para. 21.

[127] AT&T Application at 11.

[128] NECA Refresh Comments at v.

[129] *Id.* at 16-18, citing *Declaratory Ruling*, 25 FCC Rcd at 13656-57, paras. 22-23 ("Although Sandwich Isles states that it ultimately anticipates 20,000 new residents of the Hawaiian home lands, it is not clear how quickly those residents are likely to arrive, particularly given past trends" (internal citations omitted)).

[130] SIC Refresh Comments at 17-18.

[131] SIC 2010 Reply Comments at 3.

[132] SIC Refresh Comments at 16.

[133] *Declaratory Ruling*, 25 FCC Rcd at 13656, para. 21.

[134] *See infra* paras. 41-44.

[135] *See, e.g.*, SIC Refresh Comments at 6-7 (asserting that "very recently, the State of Hawaii has committed an infusion of funds to the HHL which is very likely to result in a significant increase in HHL homesteads and population, with likely resulting increases in demand and usage on SIC's network, including the Paniolo Cable").

the predictive judgments and equitable analysis relied upon in the *Declaratory Ruling*. We thus find that the Bureau acted erroneously in not providing for such timely review. We find further that there is insufficient support in the updated record for the continued consideration of this equitable factor.

### d.    Anticipated Demand

41.    In the *Declaratory Ruling*, the equitable consideration of spare capacity is closely tied to that of anticipated demand. The Bureau observed that, while it had significant flexibility in considering when an investment would be used within "a reasonable time," it was concerned about SIC's inability to quantify any meaningful projected demand for the near-term future.[136] The Bureau predicted that it was "reasonable to anticipate some additional future demand for capable capacity."[137] The Bureau determined that, while it did not agree with Sandwich Isles' predictions concerning increased future demand, it still found it "reasonable to anticipate some additional future demand for cable capacity," particular as advanced services were made available.[138] The Bureau also found that some increased demand was likely to come from customers outside the NECA pool.[139]

42.    AT&T argues that SIC's claim that demand will increase is "seriously suspect."[140] AT&T asserts that "even if demand for Sandwich Isles regulated services increased tenfold, the resulting rates would pay for only 13 percent of the initial annualized lease costs."[141] AT&T notes that SIC based its lease costs on its projection of serving 20,000 subscribers over the life of the lease, and that SIC is "highly unlikely to obtain anywhere near 20,000 during the 20 year life of the facility."[142] NECA contends that customer demand was too low to support the construction of the Paniolo network when it was constructed and that demand has not increased since that time.[143] NECA states that SIC has not "demonstrated a reasonable likelihood that it will place all its leased capacity into service for the benefit of SIC's subscribers using regulated services within such [reasonable] time."[144] NECA also states that "SIC has done little to shore up its inadequate demand projections."[145] NECA disputes SIC's recent assertions about anticipated construction in the HHL, noting that such assertions are based merely on government commitments that have not been funded.[146]

43.    Sandwich Isles asserts that the HHL population growth projections it previously put

---

[136] *Declaratory Ruling*, 25 FCC Rcd at 13656-58, para. 22.

[137] *Id.* at 13658-59, para. 23.

[138] *Id.* at 13658-59, para. 23.

[139] *Id.* at 13656-57, para. 23; 13652, para. 13 n.43 (noting that the Commission previously "allowed inclusion of costs only for fully constructed plant that will be used to provide regulated service within 12 months") (internal citations omitted).

[140] AT&T Application at 7 (internal quotation marks omitted).

[141] *Id.* at 7.

[142] AT&T 2010 Comments at 18.

[143] NECA Refresh Comments at 16-18 ("Based on the current data available, and SIC's burden of justifying the level of its expenses and investment, NECA's judgment continues to be the same as it was in 2010: the Paniolo lease expenses and capacity are excessive for what is reasonably required to provide regulated service, i.e., is not used and useful)." NECA also states that it "does not have any data concerning the amount of capacity that SIC broadband subscribers currently use, how much such usage reasonably requires of the Paniolo cable system, how much of such usage is served by facilities purchased from third parties, and the realistic expected trends in DSL subscribers in the relatively near future." *Id.* at 17 n.58.

[144] NECA Refresh Comments at 21.

[145] NECA Refresh Reply at 7.

[146] *Id.* at 7.

Federal Communications Commission     FCC 16-166

forward have proven too "optimistic" and blames "negative externalities"[147] as well as "the economic downturn in the years 2007-2010 … [which] could not have been reasonabl[y] predicted."[148]  Sandwich Isles asserts that this unpredictably low population growth has been "offset significantly by rapidly-increasing demand … for broadband services and capacity."[149]  Sandwich Isles again predicts a "significant increase in HHL homesteads and population, with likely resulting increases in demand and usage."[150]  Sandwich Isles also asserts that, as demand increases, consumer prices will drop.[151]

44.     We agree with AT&T that it no longer appears reasonable to rely on anticipated demand as an equitable factor in this case.[152]  Despite its optimism, SIC presents no concrete evidence to support the notion that the Paniolo cable network has been, or will be, subject to greater demand within a reasonable period of time.  Nothing in the record indicates a significant increase in demand or usage on the Paniolo network.[153]  Additionally, as discussed above, the used and useful standard requires that the benefit from an investment must be realized within a reasonable period of time, and that ratepayers not be forced to subsidize services that they do not enjoy.[154]  We find that insufficient evidence exists to continue supporting the ongoing reliance on this equitable factor to support relief.

### 2.     Costs Allowed in Revenue Requirement

45.     Based on this analysis of the predictive determinations made in the *Declaratory Ruling* and on a careful review of the updated record in this docket, we find that it no longer makes sense to rely on the equitable factors used by the Bureau in the *Declaratory Ruling* on a going-forward basis to support inclusion of the allowed disputed amounts.[155]  We recognize that SIC has received funding from the NECA pool based on the Bureau's determination of equitable factors since the implementation of the *Declaratory Ruling.*[156]  We find, however, that it is appropriate to terminate inclusion of these disputed amounts and allow SIC to provide NECA with the necessary support for its <u>current</u> revenue requirement to the extent that is more than the amounts allowed by NECA under its used and useful analysis.

---

[147] SIC Refresh Comments at 29.

[148] *Id.* at 29.

[149] *Id.* at 6.

[150] *Id.* at 6-7.

[151] *See, e.g.,* SIC White Paper at 31 (asserting that "NECA ignored data that demonstrates the competitive benefits of the construction of the Paniolo cable …. The introduction of new competition and the resulting decline in prices is one of the factors that makes the Paniolo cable used and useful and will lead to increased demand and uptake of the new cable capacity"); *id.* at 6 ("The very factors recognized as important in a public policy evaluation, as identified by the Commission in prior decisions … are ignored by NECA. These factors include … the competitive benefits of adding a new cable which has driven down rates in the market, as shown by the prices obtained by NECA after construction of the Paniolo cable."). *See also* SIC Refresh Comments at 6-7. *But see* NECA Refresh Comments at 20 (asserting that "under SIC's proposal, today's ratepayers would essentially be paying for a level of service that might never be provided during the length of the lease.").

[152] *See* AT&T Application at 4 ("even the most wildly optimistic growth projections will never use more than a tiny fraction of the new cable").

[153] Sandwich Isles merely asserts that it could not have foreseen the impact of an economic downturn that it identifies as well underway at that time.  SIC Refresh Comments at 6.

[154] *Declaratory Ruling,* 25 FCC Rcd at 13651-52, para. 12.

[155] *See* NECA Refresh Comments at 2-3 (stating that "FCC rules require that rate-of-return carriers justify their proposed rates …. [T]he Commission has a duty to evaluate whether NECA rates are just and reasonable." (citing *July 1, 2004 Annual Access Charge Tariff Filings,* WC Docket No. 04-372, 19 FCC Rcd 23877 at 23886-87, para. 24 (2004)) (footnotes omitted).

[156] *See Declaratory Ruling,* 25 FCC Rcd at 13650, para. 9.

Specifically, NECA shall cease allowing SIC to include 50 percent of the disputed lease costs, as well as certain other expenses, in its revenue requirement as of the effective date of this Order, as the basis of this allowance was the consideration of equitable factors that we find do not support continued relief.[157]

46.      Sandwich Isles may continue to receive the $1.9 million a year that approximates the amount that it was paying to lease voice grade capacity prior to the *Declaratory Ruling*.[158]  Sandwich Isles has the right to provide NECA with additional evidence of its current used and useful expenses beyond those previously provided for inclusion in SIC's revenue requirement.  If SIC provides NECA with sufficient evidence, we further direct NECA to timely consider it and recalculate SIC's revenue requirement for compliance with the used and useful standard in accordance with its normal processes.[159]  The burden rests with SIC to explain why any additional expenses are used and useful by providing new or additional factors and/or data.[160]

### D.      Sandwich Isles Petition for Reconsideration

47.      In its Petition, SIC seeks reconsideration of the *Declaratory Ruling*, specifically requesting that the Bureau reconsider the cost recovery methodology adopted, and award SIC "100 percent recovery."[161]

#### 1.      NECA's Spare Fiber Guidelines

48.      To begin, we reject Sandwich Isles' contention that NECA's Spare Fiber Guidelines are dispositive of the Commission's review.  Sandwich Isles asserts that NECA failed to consider its cost allocation and recovery rules that apply to the accounting treatment of spare fiber cable and wire facilities in its determination that only a portion of Sandwich Isles' submarine cable and related investment should be included in its revenue requirement.[162]  Sandwich Isles argues that NECA's Spare Fiber Guidelines clearly apply to spare Paniolo fiber and entitle the carrier to 100 percent recovery.[163]

49.      The NECA Spare Fiber Guidelines do not address the threshold "used and useful" standard that governs whether any particular cost may be included in the NECA revenue requirement for the NECA pool.  Rather, NECA's guidelines provide advice to member companies as to the appropriate accounting treatment of specific costs in accordance with the Commission's rules and orders.[164]  In

---

[157] *Id.* at 13659, para. 24 n.84 ("[W]e are not persuaded by concerns about possible financial hardship insofar as remedying such concerns would require us to allow for cost recovery from ratepayers beyond that permitted by the Act and Commission regulations.").

[158] *See Declaratory Ruling*, 25 FCC Rcd at 13654, para. 18.

[159] In the *Declaratory Ruling* the Bureau confirmed the validity of the used and useful standard as "the foundation of Commission decisions evaluating whether particular investments can be included in a carrier's revenue requirement." *Declaratory Ruling*, 25 FCC Rcd at 13651-52, para. 12.  The Bureau also stated that it "ordinarily expects [the used and useful standard] to be sufficient to resolve revenue requirements." *Id.* at 13644, para. 18.  We affirm those findings in this Order.

[160] *See* 47 CFR §§ 69.605(a), 601(c); *see also Declaratory Ruling*, 25 FCC Rcd at 13656, para. 21 n.67 ("Sandwich Isles has the obligation and responsibility to account for those differences [between usage for regulated vs. non-regulated services] in compliance with the Commission's rules and to accurately report the results of its accounting to NECA."); *id.* at para. 13662, para. 28 n.97 (citing NECA comments which state that "both parties to the pooling agreement are obligated to comply with all applicable FCC rules and orders. Thus, Sandwich Isles had an independent obligation to confirm its actions were consistent with FCC rules.").

[161] SIC Petition at 3.

[162] *Id.* at 2-3.

[163] *Id.*

[164] *See Letter* from Gregory J. Vogt, Counsel for Nation Exchange Carrier Association, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-133 at 3 (filed Apr. 14, 2011) (NECA Apr. 14, 2011 *Ex Parte* Letter).

Federal Communications Commission    FCC 16-166

particular, we agree with AT&T and NECA that the Spare Fiber Guidelines presume that the investment is "used and useful," and merely explain how cable and wireline facilities expenses and spare capacity costs are to be allocated among various regulatory sub-accounts.[165] Thus, Sandwich Isles' assertion that the Spare Fiber Guidelines require that all of the Paniolo lease payments be included in Sandwich Isles' revenue requirement, regardless of Commission policies or decisions, is incorrect. Rather, the threshold step in the ratemaking process is the application of the "used and useful" standard to determine the expenses that a carrier may include in its revenue requirement and thus recover from ratepayers.[166] The Spare Fiber Guidelines provide no basis to overturn the *Declaratory Ruling*.

50.    We also reject Sandwich Isles' argument that NECA misled the Bureau by failing to advise the Commission of the Spare Fiber Guidelines.[167] Because the Spare Fiber Guidelines do not control the Commission's determination of whether the Paniolo cable is "used and useful," NECA was under no obligation to produce them in the context of this proceeding.[168]

### 2.    Study Area Waivers

51.    We disagree with Sandwich Isles' characterization of the *Study Area Waiver Orders*,[169] which simply repeats arguments considered and correctly rejected by the Bureau in the *Declaratory*

---

[165] *See* AT&T 2010 Comments at 13; NECA 2010 Comments at 3. NECA's guidelines interpret sections 36.152 and 36.153 of the Commission's rules, which explain the jurisdictional separations process in which carriers are required to allocate property costs, revenue, expenses, taxes, and reserves as recorded by the company for the process of separating interstate costs and intrastate costs. *See* 47 CFR § 36.152-53; AT&T 2010 Comments at 9. Other Commission rules and policies must also be applied in establishing interstate access rates. First, the carrier must apply the "used and useful" doctrine to determine whether the investment should be included in the costs of providing regulated telecommunications service. If the particular investment is found to be "used and useful," then the carrier must determine whether the investment is expected to be used for regulated or non-regulated purpose in accordance with the Commission's cost allocation rules. Once the costs are determined to be regulated, they are then assigned to cost categories in accordance with Part 36 of the Commission's rules. *See* NECA April 14, 2011 *Ex Parte* Letter at 3.

[166] *See Investigation of Access and Divestiture Related Tariffs*, CC Docket No. 83–1145, Memorandum Opinion and Order, 97 FCC 2d 1082 at 1088, para. 16 (1984) ("The starting point for developing or reviewing a rate filing is establishing an overall revenue requirement. A carrier is entitled to charge rates which recover allowable expenses and a reasonable return on the investment in property *used and useful* for service to the public. This amount is the revenue requirement.") (emphasis added); *AT&T Phase II Order*, 64 FCC 2d at 37, paras. 110-111 (noting that "[t]he starting point in calculating [a carrier's] revenue requirements is a determination of the 'fair value' of its rate base," and that the Commission "has always applied the used and useful standard" to make that determination).

[167] SIC Petition at 1-2.

[168] Sandwich Isles filed an emergency motion requesting access to NECA rules and regulations, claiming that NECA would not permit Sandwich Isles' counsel to gain access to NECA accounting guidelines even though Sandwich Isles had access to the guidelines as a NECA member. *See Sandwich Isles Communications, Inc.*, Emergency Motion Requesting Access to NECA Rules, Regulations, Guidance and Precedent of Any Type Relied Upon by NECA, Carriers or Regulatory Personnel in Connection with the Access Charge Regime, WC Docket No. 09-133 (filed Dec. 16, 2010). Sandwich Isles and its counsel should have access to all relevant NECA guidelines, and it appears they do. *See* NECA April 14, 2011 *Ex Parte* Letter at 4 (explaining that Sandwich Isles has access to all of the NECA guidelines through the members-only database and can either print out the guidelines and provide them to its attorneys, or make online access available to its attorneys through the same security procedures that Sandwich Isles follows). Accordingly, we find that Sandwich Isles' emergency motion is moot and dismiss it. We also note that a copy of the Spare Fiber Guidelines were attached to the Sandwich Isles Petition, so they are now part of the record. *See* Sandwich Isles Petition, Exh. A, Harper Declaration at 6. Finally, Sandwich Isles, as a NECA member, could have provided its counsel a copy of the Guidelines much earlier in this proceeding, and thus, raising them at this time does not meet the standard for their consideration on reconsideration. *See supra* note 39.

[169] See *High Cost Loop Waiver Order*, *Study Area Waiver Order*.

18

Federal Communications Commission                                      FCC 16-166

*Ruling.*[170] Sandwich Isles reiterates its argument that previous Bureau orders approving waivers that allow SIC to participate in the NECA pool also constituted a binding decision that all of SIC's costs are used and useful and thus fully recoverable through the NECA pooling process.[171] As the Bureau explained, although the Accounting and Audits Division granted a waiver to allow Sandwich Isles to participate in the NECA pool,[172] it did not consider whether it was in the public interest to include all of the lease costs currently subject to dispute in the NECA revenue requirement.[173] The public interest analysis in the *Study Area Waiver Orders* context was focused more generally on whether the public interest would be served by extending service to consumers in the area at issue and did not address whether particular attendant costs would be prudently incurred and "used and useful."[174] Thus, contrary to Sandwich Isles' contention, the Bureau had not previously approved the eventual costs of Sandwich Isles' network for inclusion in the NECA pool, and we affirm the Bureau's conclusions regarding this issue.[175]

### 3. Application of the Used and Useful Standard

52.      Sandwich Isles claims that the Bureau misapplied the used and useful standard in the *Declaratory Ruling* on multiple grounds. First, it argues that the Bureau erroneously awarded only $1.9 million for the fiber currently being used and claims that the cost of that fiber constitutes 98 percent of the total cost of the Paniolo cable.[176] Sandwich Isles argues further that the Bureau should have awarded 100 percent recovery for the terrestrial portion of the Paniolo cable network.[177] Finally, Sandwich Isles argues that the Bureau's decision to include 50 percent of the Paniolo cable lease expense in Sandwich Isles' revenue requirement was inequitable and unjust.[178] We disagree with SIC's arguments regarding the Bureau's application of the used and useful standard.

53.      As discussed above, the used and useful standard provides the foundation of the Commission's decisions evaluating whether particular investments can be included in a carrier's revenue requirement.[179] In this situation the Bureau found that "just as 50 percent recovery was appropriate on the particular facts of the PSV cable case, this allocation provides appropriate recovery for Sandwich Isles investors through NECA tariffed rates in light of the benefits arising from the investment."[180]

54.      We reject Sandwich Isles' argument that "[t]he [Bureau in the *Declaratory Ruling*] misapplie[d] the [used and useful] standard when it award[ed] only $1.9 million for the in-use fiber when the record evidence shows, and the [Bureau] finds, that the cost of the in-use fiber is 98 percent of the

---

[170] *Declaratory Ruling*, 25 FCC Rcd at 13650-51, para. 10.

[171] SIC Petition at 12-13.

[172] *High Cost Loop Waiver Order*, 13 FCC Rcd at 2412, para. 13 ("[B]ecause [Sandwich Isles] plans to make large capital investments to initiate service, its company-specific rates would likely be extremely high . . . . [and therefore] it is in the public interest to permit [Sandwich Isles] and its potential customers to benefit from both the cost savings and lower rates available through NECA participation.").

[173] *Declaratory Ruling*, 25 FCC Rcd at 13650-51, para. 10.

[174] "The public interest is served . . . because of the significant investment to provide service in areas and to customers that did not previously have service." *Study Area Waiver Order*, 20 FCC Rcd at 9007, para. 19 (emphasis added).

[175] *See Declaratory Ruling*, 25 FCC Rcd at 13650-51, para. 10.

[176] SIC Petition at 21.

[177] *Id.* at 22-23.

[178] *Id.* at 23-24.

[179] *See supra* paras. 10-14.

[180] *Declaratory Ruling*, 25 FCC Rcd at 13660, para. 25.

Federal Communications Commission                                    FCC 16-166

total cost of the Paniolo cable."[181]  Sandwich Isles mischaracterizes the Bureau's findings in the *Declaratory Ruling*.  First, the Bureau determined that the correct amount to include in the revenue requirement was the $1.9 million that SIC previously had established was "used and useful" for the provision of the relevant services and allowed in addition on equitable grounds 50 percent of the total cost of the cable lease plus certain additional expenses.[182]  Second, the Bureau did not find that "the cost of the in-use fiber is 98 percent of the total."[183]  The Bureau cited a statement by Sandwich Isles that the difference in construction cost between a 12 fiber system and 48 fiber system was approximately 2 percent to support inclusion of some amount of spare capacity when the cable was built—nothing more.[184]  Further, in applying the used and useful standard, the Bureau determined that "only a very small portion of the capacity leased on the cable currently is in use by Sandwich Isles to provide regulated services,"[185] and it expressed concern that Sandwich Isles would be unable to quantify any meaningful projected growth in demand for the near future.[186]  As NECA explained, the used and useful analysis requires that regulated ratepayers realize the benefit from the investment in a reasonable time.[187]  Although Sandwich Isles anticipated 20,000 new residents of the Hawaiian Home Lands,[188] the Bureau found that it was not clear how such an estimate foreseeably could be achieved given the rate of construction of new housing in the Hawaiian Home Lands.[189]  The Bureau also observed that there were already two submarine cables serving the Hawaiian Islands.[190]  The Bureau concluded that there was no data in the record to substantiate SIC's assertion that the existing submarine cables were inadequate to meet future demand and SIC has not established a basis to conclude otherwise.[191]

55.        We also reject Sandwich Isles' arguments that the Bureau should have applied the used and useful standard to award 100 percent cost recovery for the Paniolo terrestrial construction.[192]  Sandwich Isles claims that for more than ten years NECA has not disputed that Sandwich Isles' existing terrestrial network is used and useful and has accepted the costs of the terrestrial network into the NECA

---

[181] SIC Petition at 21.

[182] *See Declaratory Ruling*, 25 FCC Rcd at 13654, para. 17.

[183] SIC Petition at 21.

[184] *Declaratory Ruling*, 25 FCC Rcd at 13656 n.65; *see also* SIC 2009 Comments at 14.

[185] *Id.* at 13654, para. 17.

[186] *Id.* at 13656-58, para. 22.

[187] "Sandwich Isles has not adequately demonstrated a reasonable likelihood that it will place all its leased capacity into service for the benefit of Sandwich Isles' subscribers using regulated services within [a reasonable] time." NECA 2009 Comments at 21.  NECA also questions SIC's decision to lease 100 percent of the network from Paniolo, rather than leasing only a portion of the system required to serve customers in light of realistically expected demand.  *See* NECA Refresh Comments at 22.  *See also* NECA Apr. 14, 2011 *Ex Parte* Letter at 2 (asserting that "SIC did not provide a sufficient justification to NECA for its decision to lease 100 percent of the cable's capacity, especially given that carriers often partner with each other in order to share the costs of expensive networks").

[188] *See, e.g.,* Sandwich Isles 2009 Comments at 4; Sandwich Isles 2010 Reply Comments at 22.  In its refreshed comments, SIC states that it still anticipates "[s]oon-[t]o-[b]e [r]ising [r]egional [d]emand."  SIC Refresh Comments at 20-21.

[189] *Declaratory Ruling*, 25 FCC Rcd at 13657, para. 22; NECA April 14, 2011 *Ex Parte* Letter at 1; *see also* NECA Refresh Comments at 7.

[190] *Declaratory Ruling*, 25 FCC Rcd at 13654-55, para. 19.

[191] *Id.* at 13656-57, para. 22.  Sandwich Isles has provided no credible evidence as to how much of the Paniolo cable is actually "in-use."  The used and useful standard requires the Commission to evaluate whether the fiber at issue is being used to provide regulated services.  *Id.* at 13652, para. 13 (internal citations omitted).

[192] SIC Petition at 22.

pool.[193] Sandwich Isles further argues that construction of the Paniolo terrestrial fiber would be necessary even if it had continued leasing submarine cable capacity from other carriers.[194] These arguments are unpersuasive. First, in this situation, the undersea and terrestrial portions are all part of the same Paniolo cable system. Whether the expenses associated with Sandwich Isles' previous terrestrial network were used and useful has no bearing on whether Sandwich Isles' Paniolo-related expenses are used and useful. Further, the fact that NECA has in the past accepted expenses associated with SIC's non-Paniolo-related terrestrial network does not establish that 100 percent of the expenses associated with the terrestrial portion of the much more extensive Paniolo network are used and useful. Thus, Sandwich Isles has not established a basis to treat the terrestrial portion of the Paniolo network different than the undersea cable for purposes of determining the appropriate revenue recovery allowance in this context.

56.    In addition, SIC provides no evidence to support its assertion that the Paniolo terrestrial fiber would have been necessary if it had continued to lease submarine cable capacity from other carriers. Sandwich Isles merely submitted maps showing where the new terrestrial fiber is located in relation to various cable landing points.[195] Although SIC demonstrates from those maps that the Paniolo landing sites differ from other carrier's landing sites and also shows the location of Sandwich Isles' terrestrial facilities, the maps do not establish that the Paniolo terrestrial fiber would have been necessary, consistent with the used and useful standard, if Sandwich Isles had continued to lease capacity from other carriers. Furthermore, the maps do not disprove NECA's contention that Sandwich Isles could have continued providing service to its customers by leasing fiber from other carriers.[196] And certainly before the Paniolo cable system was built, Sandwich Isles does not suggest that it was unable to lease terrestrial connections to the other submarine cables for use to provide service to its customers.

57.    We also reject Sandwich Isles' claims that it was an inequitable and unjust application of the used and useful standard to not allow it to include 100 percent of the Paniolo lease expense in its revenue requirement.[197] Sandwich Isles claims that it reasonably relied upon the *Study Area Waiver Orders* and exercised reasonable, good faith judgment in constructing the Paniolo cable. The Bureau's decision represents a reasonable determination that, because of "the current lack of use of the cable and a lack of substantial record evidence concerning future demand,"[198] a strict used and useful analysis would find only $1.9 million appropriate for inclusion.[199] As explained in the *Declaratory Ruling*, the Commission has discretion to weigh additional equitable considerations in its used and useful analysis as the Bureau did in that order.[200] Those additional equitable considerations included the unique geographic challenges in Hawaii, the special role of Sandwich Isles in serving the HHL, and the logical decision to include some spare capacity in the cable.[201] Balancing these equitable factors with the used and useful analysis, the Bureau determined that 50 percent of the Paniolo cable network lease expenses subject to

[193] *Id.* at 21.

[194] *See* Letter from Dana Frix, Counsel to Sandwich Isles Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-133, Exh. 1 at 2 (filed April 25, 2011) (Sandwich Isles Apr. 25, 2011 *Ex Parte* Letter).

[195] Sandwich Isles Apr. 25, 2011 *Ex Parte* Letter at Attach. B.

[196] *See* NECA Apr. 14, 2001 *Ex Parte* Letter at 2; *see also* NECA Refresh Comments at 22.

[197] SIC Petition at 1, 7.

[198] *Declaratory Ruling*, 25 FCC Rcd at 13654, para. 17.

[199] *See id.* at 13654, para. 18.

[200] *Declaratory Ruling*, 25 FCC Rcd at 13652-53 para. 14. As explained above, the Commission has discretion to take additional equitable considerations into account. *See supra* paras. 11-14. We conclude that the Bureau did so appropriately here.

[201] *See Declaratory Ruling*, 25 FCC Rcd at 13654, para. 18.

Federal Communications Commission                    FCC 16-166

dispute—in addition to the $1.9 million allowed by NECA—should have been included in the recovery.[202] Sandwich Isles provides no substantial basis for reversing the decision to grant further equitable relief.

58.    Finally, SIC argues that the *Declaratory Ruling* constitutes impermissible retroactive rulemaking because it "creates and imposes upon SIC an entirely new and novel requirement that carriers demonstrate anticipated demand for spare fiber based upon carrier specific evidence of demand for regulated services."[203]  We disagree.  This is not a new requirement, it is a core principle relevant to the review of a carrier's revenue requirement applied to "the unique facts and circumstances at issue here."[204] The principle that ratepayers may not fairly be forced to pay a return except on investment that can be shown to directly benefit them is central to the question of whether particular investments can be included in a carrier's revenue requirement under the used and useful standard.[205]  Additionally, contrary to Sandwich Isles' assertions, these long-standing requirements are consistent with both the NECA guidelines and Commission rules regarding jurisdictional separations.[206]  As explained above, the NECA guidelines and these Commission rules address how to allocate costs among various regulated accounts, not how to determine whether those costs are used and useful and therefore can be included for recovery in the NECA pool.  Thus, we find no retroactive rulemaking here, and further find that Sandwich Isles provides no basis to overturn the Bureau's ruling; accordingly, we deny the Sandwich Isles Petition.

## IV.    ORDERING CLAUSES

59.    ACCORDINGLY, IT IS ORDERED, pursuant to sections 1, 4(i), 4(j), 5(c)(5), 201-205, 405 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 155(c)(5), 201-205, 405, and sections 1.104(b) and 1.115(g) of the Commission's rules, 47 CFR §§ 1.104(b), 1.115(g), Application for Review of AT&T, Inc. is GRANTED to the extent discussed above.

60.    IT IS FURTHER ORDERED, pursuant to sections 1, 4(i), 4(j), 5(c)(5), 201-205, 405 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 155(c)(5), 201-205, 405, and sections 1.104(b), 1.106(p)(3), and 1.115(g) of the Commission's rules, 47 CFR §§ 1.104(b), 1.106(p)(3), and 1.115(g), that the Petition for Reconsideration of Sandwich Isles Communications, Inc. is DENIED.

61.    IT IS FURTHER ORDERED that the Emergency Motion of Sandwich Isles Requesting Access to NECA Rules, Guidance and Precedent is DISMISSED as MOOT.

62.    IT IS FURTHER ORDERED that the National Exchange Carriers Association (NECA) shall cease allowing 50 percent of the disputed lease costs, as well as other expenses, in Sandwich Isles Communications, Inc.'s revenue requirement upon the effective date of this Order.

63.    IT IS FURTHER ORDERED that, pursuant to section 1.103 and 1.4(b)(2) of the Commission's rules, 47 CFR §1.103 and 1.4(b)(2), this Order SHALL BE EFFECTIVE upon release.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[202] *See id.* at 13360, para. 25.

[203] SIC Petition at 10 (emphasis omitted).

[204] *Declaratory Ruling*, 25 FCC Rcd at 13647, para. 1.

[205] *Id.* at 13651-52, para. 12.

[206] *See* 47 CFR §§ 36.152-153.